UNITED STATES of America, Plaintiff,

· v.

Anthony SANTUCCI et al., Defendants.

No. 80 CR 349.

United States District Court,
N. D. Illinois, E. D.

Dec. 30, 1980.

Ann C. Williams, Asst. U. S. Atty., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for plaintiff.

Robert A. Korenkiewicz, Elliot M. Samuels, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Defendants Loster Avery ("Avery") and Joseph Cook ("Cook") have moved to suppress statements and handwriting exemplars given by each to United States Postal Inspectors. In response to those pre-trial motions the United States acknowledged that a pre-trial hearing was necessary "to determine the issue of whether the subpoena power was abused in obtaining [that] evidence." Based on the evidence adduced at the hearing and the authorities submitted by the parties, the Court grants Avery's and Cook's motions to suppress.

### Facts

During the course of investigation of claimed thefts from the mail, and subsequent cashing by means of forged endorsements, of a large number of United States Treasury checks, Postal Inspectors Robert Bishop and Joseph Tomaino focused attention on Harvest Liquor Store, 1708 West Madison Street, Chicago, as the place where such offenses had likely occurred and on defendants Avery and Cook as two of the persons likely to have been involved in such forgeries. In pursuit of that investigation, they obtained from Assistant United States Attorney Daniel Reidy a series of subpoenas duces tecum issued under the claimed authority of grand juries and calling for grand jury appearances to produce handwriting exemplars, fingerprints and photographs.

In fact none of the subpoenas was issued under specific grand jury authority. Although Avery provided the disputed materials (including a statement given at the time

he furnished the requested evidence) early in *1977*, he did so to the Postal Inspectors at the United States Post Office and never appeared before a grand jury until May *1978*. That same Special March 1978 Grand Jury returned the indictment against Avery, Cook and the other defendants June 11, *1980*. Similarly, Cook also provided disputed materials (including a statement) to the same Postal Inspectors at the United States Post Office in August and October *1977* and was never brought before any grand jury until November *1978*.

There are some non-critical disputes in the evidence, but for purposes of this opinion the Court finds the following to be supported by a clear preponderance of the credible evidence:

*Loster Avery*

AUSA Reidy's secretary issued under his direction, in each instance at the request of Inspector Bishop, three separate subpoenas under the purported authority of grand juries on different dates in 1976, as well as the January 31, 1977 subpoena to which Avery ultimately responded. In each instance Inspector Bishop advised AUSA Reidy what the Postal Inspectors' investigation had produced and the added information thought to be needed. In each instance the date chosen for the subpoena was one on which the grand jury was anticipated to be sitting, although each such grand jury was a regular rather than a special one, with an expected life of some thirty days. In each instance no prior grand jury authority was ever sought or obtained (indeed the May 10, 1976 subpoena, calling for appearance before the June 1976 regular grand jury and purportedly issued under its authority, was issued before that grand jury ever came into existence). Neither of the Postal Inspectors nor AUSA Reidy ever appeared before any grand jury prior to the issuance of such subpoenas.[1]

---

1. Inspector Bishop confirmed that with one exception, the first time he appeared before the grand jury on the case was June 11, *1980*, the same date on which the true bill was voted. That one exception is that in June 1977 Inspec-

tor Bishop appeared before the grand jury to obtain a writ to get defendant *John* Avery out of a state prison to obtain the same kind of handwriting exemplars. Obviously the United States knew the road to the grand jury room

It appears (though Avery himself was unclear on this score) that Avery was told that he could respond to the subpoena either by reporting to the grand jury room (even though there were no facilities there for obtaining the requested evidence) or, at his option, by coming to the Post Office to meet with the Postal Inspectors. It is unquestioned that when he came to the Post Office, Avery was told by Inspector Bishop that he was not under arrest, Avery was read his rights and signed a waiver of rights and was treated with courtesy during the extended course of providing the handwriting exemplars (over a two-day period) and fingerprints. It is also unquestioned that except for the fact that his presence at the Post Office was under compulsion of law (that is, in response to the subpoena duces tecum) Avery's provision of the evidence and the contemporaneous oral statement (reduced to typewritten form by Inspector Tomaino and signed by Avery) was without any other element of coercion. Avery was not represented by counsel, but waiver of counsel was part of the waiver of rights form presented to and signed by him after an explanation of its terms. Avery was not a grammar school graduate, his schooling having terminated after third grade. In general it appeared at the hearing that he did not readily comprehend the questions posed to him and was easily led to answers by the way in which questions were put (whether by his own counsel or by AUSA Williams).[2]

### Joseph Cook

All subpoenas for Cook, including the one to which he ultimately responded by furnishing the requested evidence (and a contemporaneous handwritten statement) to the same two Postal Inspectors at the Post Office, were issued under the identical procedure as with Avery. Again the first subpoena ("served" on Josephine Avery, Avery's niece and merely an acquaintance of Cook!) was issued May 10, 1976 under the purported authority of a then-nonexistent June 1976 grand jury. Another subpoena was served on Cook in April 1977 and not responded to, and Cook's ultimate appearance to meet with the Postal Inspectors was in response to a July 1977 subpoena. Again *none* of the subpoenas, including the one to which Cook responded, was issued with any grand jury approval or involvement having been sought or obtained.

As to Cook, who did not testify, the evidence is that the one time he was personally served with a subpoena he too was told that he was not under arrest.[3] When Cook did come to the Post Office on August 1, 1977 (during which meeting he gave an oral statement in addition to handwriting specimens) and again October 18, 1977 (a continuation of the August 1 meeting, during which continuation Cook was fingerprinted and gave a handwritten statement), he too was read his rights and signed a waiver on each occasion. Cook was also not represented by counsel, but waiver of counsel was part of the waiver of rights form presented to and signed by him at the outset of each appearance at the Post Office.

### Principles Governing Suppression in This Case

This action presents one phase of the familiar questions posed by the relationship between the prosecutor's office and the

---

for the obtaining of authority when it believed it needed to do so.

**2.** It is not the Court's intention to be critical of counsel in any respect. Each handled the hearing with a high degree of professionalism. Rather the Court's point is that it is difficult to evaluate the testimony of a witness who is so pliable to questioning.

**3.** Inspectors Bishop and Tomaino differed as to whether Cook was told about the option of

appearing at the grand jury (though once again no arrangements for such appearance were in fact made) or at the Post Office offices of the Postal Inspectors. Bishop testified that he was not, while Tomaino testified that he was. Although the Court credits Bishop's testimony in that respect, in the Court's view the issue is not significant in light of the fact that in any event Cook ultimately elected to go to the Post Office under the legal compulsion of the subpoena calling for grand jury appearance.

grand jury.[4] It does *not* deal with the kind of problem that has most often resulted from tension between investigations by the grand jury and by the United States Attorney alone (for example, the prosecutor's use of grand jury powers to obtain evidence for *civil* litigation or to obtain evidence for an *already* indicted criminal offense). Instead the issue is whether the customary use of blank subpoenas without any grand jury participation taints evidence obtained as a result of that compulsory process.

Holderman at 7 (citing authority for each branch of the dichotomy) summarizes the operative rules thus:

> Government attorneys engaged in grand jury investigations properly may have subpoenas issued without the grand jury's authorization or awareness to compel attendance of witnesses before the grand jury, but they may not use the grand jury subpoena power to gather information without the intended participation of the grand jury.

After a discussion of the issue as it bears on proposed *testimony* by a witness, Holderman at 8 deals specifically with the issue presented by this case:

> A similar situation arises when a witness has been subpoenaed to appear before the grand jury to present nontestimonial evidence such as fingerprints or handwriting exemplars. Typically, this type of evidence is not obtained in the grand jury's presence because handwriting exemplars and fingerprints are usually not meaningful to the grand jury without review and analysis. To conserve the grand jury's time, prosecutors often have the material analyzed after it has been acquired (through the use of grand jury subpoenas), but before the material or the witness providing it has actually been presented to the grand jury. Where prosecutors conducting a grand jury investigation have not obtained the approval or direction of the grand jury to proceed with the requisition of the material through the use of the subpoena power,

their actions have been held to be an abuse of the grand jury subpoena power.

There is no controlling law on the issue on this circuit. Maximum light on the subject is cast by the two cases cited by Holderman (*In re Melvin*, 546 F.2d 1 (1st Cir. 1976) and *United States v. O'Kane*, 439 F.Supp. 211 (S.D.Fla.1977)) and two other decisions of less direct applicability (*Durbin v. United States*, 221 F.2d 520 (D.C.Cir. 1954) and *In re Grand Jury Proceeding (Schofield)*, 486 F.2d 85 (3d Cir. 1973)).

*Melvin* is somewhat distinguishable on the particular facts, but the *principle* it enunciates is fully applicable here (546 F.2d at 4–5):

> Because of its special investigative function and "the historically grounded obligation of every person to appear and give his evidence before the grand jury", *United States v. Dionisio, supra*, 410 U.S. at 9–10, 93 S.Ct. at 769, a grand jury alone enjoys the inherent right to compel production of identification evidence in these circumstances. Grand jury subpoenas to testify are deemed "not that kind of governmental intrusion on privacy against which the Fourth Amendment affords protection...." *Fraser v. United States, supra*, 452 F.2d at 620. The grand jury, at least in theory, exercises these broad investigative powers "under the authority and supervision of the court", *United States v. Stevens*, 510 F.2d 1101, 1106 (5th Cir. 1975), as a representative of the public. To be sure, the powers of the United States Attorney in connection with a grand jury investigation are substantial. He may, in practice, select the witnesses to be subpoenaed to appear before the grand jury and generally direct the investigation, *see* 8 Moore's Federal Practice ¶ 6.02[1]. The United States Attorney may obtain subpoenas issued in blank by the court, fill in the blanks, and have the witnesses served without consulting the grand jury, *see* Fed.R.Crim.P. 17(a); 8 Moore's Federal Practice ¶ 17.06. Still, he may not use his subpoena powers

---

**4.** See generally Holderman, Preindictment Prosecutorial Conduct in the Federal System, 71 J.Crim.L. & C. 1 (1980) (hereinafter cited "Holderman at—").

under Rule 17 to gather evidence without the participation of the grand jury.

*O'Kane* on the other hand is really indistinguishable from the present case. As the Court there put the matter (439 F.Supp. at 214):

The issue remains, therefore, whether an Assistant U.S. Attorney has the authority to require a subpoenaed grand jury witness to provide handwriting exemplars without a directive from the grand jury. The U.S. Attorney's powers in connection with a grand jury investigation are substantial. He may propose witnesses to be subpoenaed, have subpoenas issued in blank by the court served without consulting the grand jury, and generally direct the investigation. *In re Melvin*, 546 F.2d 1, 5 (1st Cir. 1976). The grand jury may act on evidence offered by the prosecutor. *Balliro, supra*, at 1179. The prosecutor may even suggest that a witness be called to give exemplars without "impugn[ing] the integrity of the grand jury's investigation." *Shaw, supra*, at 1300. However,

"[t]he Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. They recognize the primary and nearly exclusive role of the Grand Jury as the agency of compulsory disclosure." They do not recognize the United States Attorney's office as a proper substitute for the grand jury room and they do not recognize the use of a grand jury subpoena, a process of the District Court, as a compulsory administrative process of the United States Attorney's office. *Durbin v. U. S.*, 94 U.S.App.D.C. 415, 221 F.2d 520, 522 (1954) (dicta), *quoting U. S. v. O'Connor*, 118 F.Supp. 248, 250–251 (D.Mass.1953).

After analyzing *Melvin* the *O'Kane* Court continued (*id.* at 215):

In accordance with its analysis and the First Circuit's persuasive decision, this court concludes that it is not sufficient that an individual be subpoenaed before the grand jury for the U.S. Attorney's office to be empowered to obtain exemplars; the grand jury itself must direct the furnishing of nontestamentary evidence such as handwriting exemplars. Without such a directive, under the facts of this case, the district court does not have jurisdiction to compel the evidence sought.

There as here the *O'Kane* Court then had to deal with whether the challenged evidence was given voluntarily (*id.*):

Defendant O'Kane argues that the exemplars were provided under coercive threat of a contempt charge. The government contends that they were given voluntarily because the witnesses were given a choice as to when to provide the exemplars and because no one objected.

In that respect this Court finds that the sole function of a subpoena ("under penalty") is to *compel* action. It is a *command* to appear and, in the case of a subpoena duces tecum, to *produce* evidence. It concludes that its target "not depart the Court without leave thereof or of the United States Attorney. And this you shall in nowise omit under the penalty of the law in that case made and provided." Under those circumstances the legal effect of the subpoena is the same whether the threat of contempt has been articulated, as in *O'Kane*, or is simply inherent in the process, as here. Each of Avery and Cook provided the material under compulsion of law, and not in the legal sense "voluntarily." As for the other two relevant cases, *Durbin* (see the language quoted above in *O'Kane*, also quoted in *Melvin*) was the cornerstone on which *Melvin* and in turn *O'Kane* were constructed. *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85, 91–92 (3d Cir. 1973), after reciting the kinds of flaws (such as that in *Durbin*) that may lead to non-enforcement of subpoenas, makes plain the broader dimension of the problem:

Although we have described these defenses to an enforcement proceeding as nonconstitutional, improper use of a subpoena does have constitutional overtones, for as Judge Friendly observed in *United States v. Doe*, 405 F.2d 436, 438 (2d Cir. 1968), "[e]ven though evidence is not

within a testimonial privilege, the due process clause protects against the use of excessive means to obtain it."

In response the United States proffers only Judge Weinstein's thoughtful opinion in *United States v. Kleen Laundry & Cleaners, Inc.,* 381 F.Supp. 519 (E.D.N.Y.1974). But though Judge Weinstein recognizes, as does this Court, the practicalities of the general practice of blank subpoenas and the impracticality of over-technical requirements of grand jury involvement, his opinion really *supports* the force of the decision reached here:

1. What was sought in *Kleen Laundry* and rejected by Judge Weinstein was dismissal of the indictment, not as here suppression of the evidence. As Judge Weinstein stated (381 F.Supp. at 524):

> Defendants' proper remedy is to move to suppress evidence at the trial [citing extensive authority]. The rationale is that while constitutional exclusionary rules forbid the use of tainted evidence at trial, the rules do not bar the prosecution altogether.

2. When Judge Weinstein dealt with the possible suppression issue, he did so on grounds plainly inapplicable here (*id.*):

> It is settled that facts of which the government has prior and independent knowledge cannot be excluded solely because the government also obtained knowledge of them through some illegal means [citing extended authority on the "fruit of the poisonous tree" doctrine]. The books and records here, if independently subpoenaed for trial, would not fall under a taint since the government was obviously aware of them before the grand jury subpoena was issued.

Accordingly the Court concludes that defendants' motion to suppress the requested materials should be granted. As for the statements given by Avery and Cook contemporaneously with the furnishing of the other evidence, the Court asked counsel for the United States for any authority that would make the taint stop at the requested material, and it was cited only to the "fruit of the poisonous tree" analysis in *Wong Sun*

*v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963) and its progeny. Although there was no evidence here of separate compulsion for the making of the statements, it is plain that the connection between the initial wrong and the challenged evidence has not "become so attenuated as to dissipate the taint" and that "the evidence to which instant objection is made has been come at by exploitation of that illegality [and not] instead by means sufficiently distinguishable to be purged of the primary taint." For that reason the Court finds that the Avery and Cook statements were also not provided "voluntarily" in the legal sense and must be suppressed as well.