UNITED STATES of America,
Plaintiff-Appellant,

v.

Anthony SANTUCCI, Loster Avery and
Joseph Cook, Defendants-Appellees.

No. 81–1530.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1981.

Decided March 19, 1982.
Rehearing and Rehearing In Banc
Denied May 10, 1982.

Phillip A. Turner, Asst. U. S. Atty., Dan K. Webb, U. S. Atty., Chicago, Ill., for plaintiff-appellant.

Robert A. Korenkiewicz, Chicago, Ill., for defendants-appellees.

Before PELL and WOOD, Circuit Judges, and CAMPBELL,* Senior District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The district court, in a case involving the alleged forgery of United States Treasury checks, suppressed the handwriting exemp-

lars, fingerprints, and photographs of three defendants secured by postal inspectors through the use of grand jury subpoenas *duces tecum* restricted to those identification items. At the time those items were being obtained, each defendant made statements which were also suppressed. The government appeals pursuant to 18 U.S.C. § 3731.

## I.

The essential facts are largely undisputed. Some of the details in evidence which do not control, although mentioned here, are disputed. The trial judge in brief findings appears generally to have adopted the government's version of the principal events. Between 1976 and the filing of the indictment in 1980, two postal inspectors were engaged in an investigation of the theft and forgery of hundreds of United States Treasury and other checks stolen from the mails. When the three defendants, Loster Avery, Joseph Cook, and Anthony Santucci became suspects, the postal inspectors conferred with the Assistant United States Attorney who completed blank grand jury subpoenas *duces tecum* and gave them to the inspectors to serve.[1] The government concedes that neither were the subpoenas sought or obtained from any grand jury, nor had the case been opened before a grand jury.

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Fed.R.Crim.P. 17 provides in pertinent part:
    (a) For Attendance of Witnesses; Form; Issuance. A subpoena shall be issued by the clerk under the seal of the court. It shall state the name of the court and the title, if any, of the proceeding and shall command each person to whom it is directed to attend and give testimony at the time and place specified therein. The clerk shall issue a subpoena, signed and sealed but otherwise in blank to a party requesting it, who shall fill in the blanks before it is served. A subpoena shall be issued by a United States magistrate in a proceeding before him, but it need not be under the seal of the court.
    \*  \*  \*  \*  \*  \*
    (c) For Production of Documentary Evidence and of Objects. A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.
    (d) Service. A subpoena may be served by the marshal, by his deputy or by any other person who is not a party and who is not less than 18 years of age. Service of a subpoena shall be made by delivering a copy thereof to the person named and by tendering to him the fee for 1 day's attendance and the mileage allowed by law. Fees and mileage need not be tendered to the witness upon service of a subpoena issued in behalf of the United States or an officer or agency thereof.

The service of the subpoenas on each of the defendants followed a similar pattern.

## AVERY

Four subpoenas *duces tecum* were issued for Avery. The first was left by the postal inspectors with Avery's niece at what was believed to be his home, directing him to appear before the 1976 Grand Jury. He did not. Two additional subpoenas were issued, but not served. In 1977, Avery was served personally and required to appear before the February 1977 Grand Jury. The trial judge found that Avery also was given the oral option by the postal inspectors to meet with them at the post office to supply the identification items if he preferred that to a grand jury appearance. Later Avery called one of the inspectors, saying he did not want to go to the Federal Building, but would prefer to meet with the inspectors in their office. The inspector advised Avery, it is claimed, that he did not have to come to the office, but Avery responded that he wanted to get it straightened out and selected a date for the meeting. The Assistant United States Attorney testified that Avery also called him and discussed the subpoena.

At the meeting with the postal inspectors, Avery was first fully advised of his constitutional rights, a procedure which would have been required had he been in custody, although he was not. He executed the customary warning and waiver form. The inspectors testified further that Avery was again informed that the option was still open to him to appear before the grand jury if he preferred. Avery was advised that the purpose was to secure the identification items. Although advised he could remain silent and was not required to give any statement, Avery nevertheless proceeded to give an oral statement which, when it was reduced to writing, he signed. As Avery had an injured hand, he returned a second time to complete the handwriting exemplars. The trial court found Avery was courteously treated, but discerned that during the suppression hearing it was evident that Avery was easily led by counsel during questioning.

## COOK

A similar subpoena *duces tecum* was issued for Cook and left for Cook with Avery's niece upon her representation that she would give it to Cook. In any event, Cook did not respond. Later the inspectors served Cook personally, at which time the inspectors explained the subpoena and extended the same option of providing the identification items at their office instead of before the grand jury. Cook failed to appear at either place. The inspectors then left a new subpoena with Cook's wife, but again he did not respond. Next, according to the inspectors, they left word with Cook's father to have Cook call them or the Assistant United States Attorney. Cook called one of the inspectors and told him he wanted to come to the office and get the problem resolved. Cook suggested the date and appeared at the inspectors' office accordingly. Cook was similarly advised of his constitutional rights and also signed a warning and waiver form. Cook said he thought the problem had been resolved and began to talk about the checks. Again, he was advised that he did not have to talk to the inspectors, but the inspectors say he replied that he wanted to. Cook then proceeded to give an oral statement. When that was concluded, he said he had to leave, but agreed to return to furnish his fingerprints. He failed to appear for that appointment, but after being recontacted, he again went to the office of the inspectors. After again being advised of his rights, according to the testimony, he completed the fingerprinting process, but also added that he wanted to give a statement about what had happened in order to try to get the matter settled. Cook then gave additional incriminating oral and written statements. Cook did not testify at the suppression hearing.

## SANTUCCI

Because of poor health, Santucci did not testify at the suppression hearing, but was deposed in Arizona concerning the facts surrounding the service on him of several grand jury subpoenas *duces tecum* calling for the identification items. He tells a somewhat different version, claiming that

he was not given an option, but was told to appear at the post office or be arrested. He did go to the post office twice to meet with the inspectors, but explained that he believed he was compelled to go there and to answer all questions. Santucci further denied knowing that he was the subject of a criminal investigation, or what the warning and waiver form was which he signed. During those two trips to the inspectors' office, he provided the identification items, and in addition, as had the others, also gave a statement. The Assistant United States Attorney and the two inspectors did not testify as to Santucci, but it was stipulated that their testimony would be that the Santucci subpoenas also were not authorized by a grand jury and that Santucci was given the same option as had been given to Avery and Cook. It was further stipulated that the inspectors would testify that Santucci was advised of his rights, stated that he understood them, and was further advised that he was not under arrest, and could leave. Finally, it was stipulated that the inspectors would testify that Santucci gave a statement without coercion.

The trial judge credited the government's version of the events as paralleling what had transpired in connection with Avery and Cook.

## II.

The trial judge made clear what the issues were not. There was no dispute that the grand jury could by subpoenas *duces tecum* require handwriting exemplars, photographs, and fingerprints. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1963). There was no dispute that the grand jury could provide in its subpoena that the witness be given an option to provide the identification evidence outside the actual presence of the grand jury. *United States v. Duncan*, 598 F.2d 839, 867 (4th Cir. 1979), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1980).

As the trial judge commented, this is often a desirable practice. Nor did the trial judge see any problem with permitting the United States Attorney to fill in blank grand jury subpoenas requiring the identification material without actual prior grand jury authorization. Situations were distinguished in which the grand jury was used to gather evidence for a civil suit or for the purposes of obtaining additional evidence after indictment. *In re Grand Jury Proceedings*, 632 F.2d 1033, 1041 (3d Cir. 1980). We are in full accord with those observations on the law.

The issue was narrowed to whether or not the grand jury could be by-passed by the United States Attorney's combined use of two of the above procedures found to be permissible when occurring alone. That is, can the United States Attorney be permitted to use evidence gathered by the use of a grand jury subpoena not actually authorized by a grand jury that also gives the witness an option to satisfy that subpoena outside the presence of the grand jury? The trial court viewed the combination of permissible procedures to be constitutionally impermissible because of the absence of sufficient involvement by the grand jury. Therefore, all the identification items as well as the statements of each defendant were suppressed.

The suppression order was supported by the trial judge in two memorandum opinions [2] after consideration of various authorities beginning with an article, Holderman, *Preindictment Prosecutorial Conduct in the Federal System*, 71 J.Crim. L & C 1 (1980).

> Government attorneys engaged in grand jury investigations properly may have subpoenas issued without the grand jury's authorization or awareness to compel attendance of witnesses before the grand jury, but they may not use the grand jury subpoena power to gather information without the intended participation of the grand jury.

\* \* \* \* \* \*

2. The first memorandum opinion is found at *United States v. Santucci*, 504 F.Supp. 1072, and the second is found at *United States v. Santucci*, 509 F.Supp. 177 (N.D.Ill.1981).

A similar situation arises when a witness has been subpoenaed to appear before the grand jury to present nontestimonial evidence such as fingerprints or handwriting exemplars. Typically, this type of evidence is not obtained in the grand jury's presence because handwriting exemplars and fingerprints are usually not meaningful to the grand jury without review and analysis. To conserve the grand jury's time, prosecutors often have the material analyzed after it has been acquired (through the use of grand jury subpoenas), but before the material or the witness providing it has actually been presented to the grand jury. Where prosecutors conducting a grand jury investigation have not obtained the approval or direction of the grand jury to proceed with the requisition of the material through the use of the subpoena power, their actions have been held to be an abuse of the grand jury subpoena power. *Id.* at 7–8.

Since no controlling decision in this circuit was found, that article was used to lead to cases in other circuits found by the trial judge to be particularly helpful, *In re Melvin*, 546 F.2d 1 (1st Cir. 1976), and *United States v. O'Kane*, 439 F.Supp. 211 (S.D.Fla. 1977), together with two additional decisions, *Durbin v. United States*, 221 F.2d 250 (D.C.Cir.1954), and *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (3d Cir. 1973). We will briefly consider each.

At issue in *Melvin* was the effort of the United States Attorney to secure the appearance of the witness in a lineup. The witness had been previously subpoenaed before the grand jury only for fingerprinting and photographs. Avoiding the grand jury in connection with the lineup, the United States Attorney applied directly to the district judge who then directed the lineup appearance. On appeal that order was vacated. The court recognized that the United States Attorney may select witnesses, obtain blank subpoenas to be completed and served on witnesses without consultation with the grand jury, provided, however, that the subpoena does not become merely

the compulsory administrative process of the United States Attorney. Nevertheless, the court vacated the trial court's order. It determined that the trial court's order which required the attendance outside the grand jury room at a proceeding not under the grand jury's supervision of a person for whom probable cause to arrest had not yet been found went "considerably beyond the routine issuance of subpoenas and other actions in which the United States Attorney has proceeded without specific direction of the grand jury." *In re Melvin*, 546 F.2d at 5. It was labeled "a major intrusion upon personal liberty," and a power in the United States Attorney of such magnitude that it was unacceptable. *Id.* We are in agreement with the line drawn in that case, but it does not resolve the present issue.

*O'Kane* is slightly more analogous to this case. O'Kane in response to a subpoena (it does not appear to have been a subpoena *duces tecum*) issued by the grand jury appeared at the grand jury room. However, prior to testifying he was required by an Assistant United States Attorney to give a handwriting exemplar which he was informed he either could give voluntarily or be taken before the judge and ordered to do so under threat of contempt. O'Kane gave the exemplar without the necessity of any encouragement from the judge, but later moved to suppress the exemplars as involuntary and illegally obtained. Suppression was ordered because the grand jury had not directed the taking of the handwriting exemplars and because they were provided under a coercive threat of contempt rendering them involuntary.

*O'Kane* is distinguishable. In the present case the subpoena *duces tecum* called only for non-testamentary evidence to which was added an oral option as to where the response could be made. The defendants were fully advised of their rights including the right to remain silent. The trial court found no actual coercion by the postal inspectors, nor any threat of contempt, but did find that the printed language on the face of the subpoena form itself was coercion enough to override any possibility that the responses could be considered voluntary.

The defendants rely largely on *Melvin* and *O'Kane* to support their claim that the defendants' Fourth and Fifth Amendment rights were violated as well as the provisions of Rule 17.

In *Durbin*, a conviction was reversed because the United States Attorney by use of a grand jury subpoena required a witness to make several trips to his office for interrogation without ever taking the witness before the grand jury. *Durbin* gives us little guidance in this case.

*Schofield* was the appeal by a witness of an order of contempt for failing to provide handwriting exemplars, fingerprints and for not permitting a photograph to be taken. Schofield had been served with a grand jury subpoena to testify, but when he appeared to testify he was instead directed by the United States Attorney to submit to the identification requests. Upon refusal, contempt followed. The case was reversed upon the basis that the government failed to make a showing that the identification items were relevant to an investigation being conducted by the grand jury within its jurisdiction. The identification items were not suppressed as the case was remanded to give the government the opportunity to make the required showing. The court imposed those requirements on the United States Attorney in grand jury subpoena enforcement proceedings pursuant to its supervisory powers. *But see In re Pantojas*, 628 F.2d 701, 704–05 (1st Cir. 1980); *In re Liberatore*, 574 F.2d 78 (2d Cir. 1978). *Schofield* offers no solution for the present case.

We agree with the trial judge that in the search for a fair resolution of the subpoena problems some support in principle may be found in the authorities upon which he relied.

In addition to supporting the decision of the trial judge the defendants argue here that the subpoenas were a nullity and contemptuous of the court. The procedures of the government are branded a fraud that should "shock of the conscience of this court." Defendants cite *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), but understandably what shocked the conscience in that case was the illegal entry into the defendant's home, the struggle to open his mouth and extract two capsules, followed by the forcible extraction of his stomach contents. However, the issue in this court is not one of enforcement of the subpoenas by a contempt proceeding, contemptuous conduct by government agents, or physical assault upon the defendants.

The defendants also attempt to head off the application of the "inevitable discovery" theory. *United States ex rel. Owens v. Twomey*, 508 F.2d 858, 865–66 (7th Cir. 1974). That doctrine which has received its share of criticism, *United States v. Hoffman*, 607 F.2d 280, 285 n.3 (9th Cir. 1979), however has no direct application to the facts in the present case.

The defendants further argue that exclusion or suppression of illegally obtained evidence is justified as a deterrence to government infringement of a person's constitutional rights. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), is also cited for the "fruits of the poisonous tree doctrine" in support of exclusion, although defendants recognize that *Nardone* permits admission of evidence if the connection between the wrongdoing and the evidence obtained has become so attenuated as to dissipate the taint. *Id.* at 341, 60 S.Ct. at 268. This is followed up with an argument based on the standard set forth in *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963), referred to by this court in *United States ex rel. Owens v. Twomey*, 508 F.2d at 865:

> In short, as the state succinctly puts it, there have evolved three tests from *Wong Sun*, any one of which, when applicable, establishes that the controverted evidence is not fruit of the poisonous tree when: (1) the evidence was discovered by an independent source; (2) the evidence is sufficiently distant in causal connection from the illegal search and seizure so that

the connection has become so attenuated as to dissipate the taint; or (3) the evidence inevitably would have been gained even without the unlawful search.

Both parties find some solace in *Wong Sun*. The defendants claim the test has not been met, relying on the trial judge's finding "that the appearances and provision of evidence by each of the defendants was involuntary—under compulsion of law represented by the subpoenas." On the other hand, the government says the test has been satisfied although its efforts to defend the issuance and use of these particular grand jury subpoenas were feeble. The government argues that even if the defendants did appear at the office of the inspectors as a result of improperly issued grand jury subpoenas, the identification items and statements do not deserve to be suppressed.

The government reminds us of *United States v. Rowell*, 612 F.2d 1176, 1179 (7th Cir. 1980), in which this court held that the defendant's fingerprints acquired as a result of a previous state arrest claimed by the defendant to have been illegal could nevertheless be used in a federal charge against him. Although the state arrest was found by this court not to have been illegal, it was stated in *dicta* that even if the arrest had been illegal the fingerprints were admissible and not precluded by *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). That comment was based on the proposition that the arrest could not be considered a "but for" cause of the use of the fingerprints, as the federal government could have secured the defendant's fingerprints through its own processes. In *Davis* the Supreme Court precluded the use of a defendant's fingerprints found to have been obtained during the warrantless roundup and illegal detention of a number of suspects. In the present case the trial judge found *Davis* to be controlling because the nexus between the illegal conduct and its fruits was so close as to invoke the deterrent purposes of the exclusionary rule. *Rowell* was distinguished by the trial judge on the basis that the fingerprints were claimed by the defendant to have resulted from an illegal

arrest by state authorities, not federal authorities. In view of *Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960), we find that particular distinction not to be cognizable. The government, on the other hand, uses *Rowell* to argue that since the government properly could require the identification items from the defendants at any time prior to trial, the fact that those items were obtained as a result of allegedly improper grand jury subpoenas is not a "but for" cause of the government's possession of those items. It would therefore serve no useful purpose, the government argues, to require it to retake the identification items with new subpoenas *duces tecum*.

The government further argues that the traditional analysis to determine voluntariness should have been applied, and the determination not made solely on the use of the particular subpoenas *duces tecum*. From *Wong Sun*, and *United States ex rel. Owens v. Twomey*, the government moves to *United States v. Duncan*, 570 F.2d 292 (9th Cir. 1978), for support. A subpoena *duces tecum* had been served on Duncan, a juvenile, charged with a government property violation involving theft of postage stamps. The subpoena required Duncan to furnish his fingerprints to either the grand jury or a postal inspector. Duncan appeared at the inspector's office, and in addition to giving his fingerprints, made an incriminating statement. At trial, Duncan moved to suppress because 18 U.S.C. § 5038(d) requires that the court itself must first authorize the fingerprinting or photographing of a juvenile. In affirming the denial of the motion to suppress, the court stated that:

> We need not decide whether section 5038(d) was violated; or, if so, whether evidence secured as a result of such a violation would be subject to suppression. Evidence is not necessarily excludable because it would not have been obtained but for a constitutional violation. The connection between the unlawful conduct and the acquisition of the evidence may become so attenuated as to dissipate the

taint. In this case we conclude that the illegality, if any, was not egregious, and that the giving of the statement and the delivery of the stamps were sufficiently the product of an exercise of free will by appellant to purge any taint resulting from the extra-judicial order to furnish fingerprints.

*Id.* at 293 (citations omitted). In coming to that conclusion the court noted that the appearance of Duncan at the inspector's office was optional, that he was given *Miranda* warnings,[3] and executed a waiver. Nothing coercive was found about the atmosphere of the meeting with the inspectors. Since the juvenile understood that he did not have to talk and could leave at any time that court found that what the government gained was voluntarily given and free of any taint from the assertedly unlawful subpoenas. The defendants attack *Duncan* on the basis, among others, that at least the subpoena used for Duncan came from the grand jury, not just the United States Attorney, and further point out that the trial judge in the present case made a factual determination that there was no attenuation to dissipate the taint of the "illegal subpoenas."

The government also directed the trial judge to *United States v. DiGilio*, 538 F.2d 972 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). The issue was the use of a "forthwith" grand jury subpoena to facilitate the interrogation of witnesses by the F.B.I. That court agreed that the subpoenas had been misused, but held that it did not follow that the incriminating statements secured during the process, if otherwise voluntary, should be suppressed by application of the court's supervisory powers.

In addition, the government cites Judge Weinstein's opinion in *United States v. Kleen Laundry & Cleaners, Inc.*, 381 F.Supp. 519 (E.D.N.Y.1974). The United States Attorney had secured the defendant's books and records by the use of a subpoena from a grand jury not yet in session, but expected to be on the return date. The grand jury was neither consulted nor notified of the acceptance of the records by an Assistant United States Attorney for the government's use thereafter in furtherance of its investigation. Over a year later the records were delivered to a subsequent grand jury. After finding that the procedure was not so egregious as to warrant dismissal of the indictment, Judge Weinstein suggested that the proper remedy was a motion to suppress if the evidence could be found to be tainted, but indicated that he was not optimistic about its success because the government had prior independent knowledge. That case is of minimal help.

The government also seeks to help itself by claiming good faith in all it did even if what it did was wrongful. The trial judge found "good faith" not to be a controlling issue, but made his view clear as to the "good faith" standard which he would otherwise have applied by contrasting the decisions a United States Attorney makes in his office with the immediate decisions a police officer often must make in the street without opportunity for research or reflection. *United States v. Williams*, 622 F.2d 830 (5th Cir. 1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). That comparison cripples the government's good faith argument.

We find nothing in the authorities examined which compels suppression in the circumstances of this case, but we see some reasonable flexibility within constitutional limits.

### III.

■ In our review of the findings of fact of the trial judge, we must accept those findings unless determined to be clearly erroneous. *United States v. Conner*, 478 F.2d 1320, 1323 (7th Cir. 1973). We have no quarrel with the findings which are purely factual. Those findings include the determinations about the issuance of the subpoenas and the general pattern of the service on the defendants. In addition and

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965).

of particular importance in this case, the trial judge found no compulsion in those circumstances, except from the face of the subpoenas themselves. He concluded on that basis that the provision of evidence by the defendants was involuntary. The trial court made an additional factual determination that the challenged evidence had not become so attenuated as to dissipate the taint. We view these latter findings, however, to be more conclusions of law than fact.

■ We need not condone the loose use of the subpoenas by the United States Attorney's office or rely upon the presumption of lawfulness and regularity which ordinarily attaches to grand jury proceedings, *In re Grand Jury Proceedings*, 632 F.2d at 1041, to arrive at a different conclusion. It can be seen that the United States Attorney, as a practical matter, is allowed considerable leeway in attempting to prepare for a grand jury investigation. Were it viewed otherwise, unnecessary problems would be created in the investigative process without substantial benefits to defendants.

The defendants chose not to test the validity of the subpoenas before responding, so whether or not the subpoenas could have been enforced by contempt proceedings is not the question now before us.

No one has said one way or the other, but it may be assumed, we believe, that the identification evidence and the statements were in time presented to the grand jury to form part of the foundation for the indictment. The grand jury was probably not totally excluded from the process. However, we do not turn the case on that assumption. Nothing in the record suggests any intent to exclude the grand jury from all exposure to the collected evidence.

■ We see no need nor did the trial judge, for the purposes of this case, to wade into the old and continuing policy debate of whether the exclusionary rule serves to prevent police misconduct as it was calculated to do. But aside from policy, at least in the circumstances of this case, exclusion serves little purpose in preventing abuse or even in repairing it because it is beyond argument that the government would have been entitled to secure the identification items by the strict issuance and use of a grand jury subpoena *duces tecum*, or by other pretrial procedures. To exclude those identification items would only delay the inevitable for the benefit of no one, but to the unnecessary detriment of expeditious law enforcement efforts.

Although the government's good faith is not determinative, it at least cannot be argued that the government agents by use of the subpoenas conspired to harass or entrap the defendants into giving up evidence the government was not entitled to. Had the defendants chosen to respond to the subpoenas by appearing at the grand jury, instead of at the inspectors' office, there apparently would have been no basis to exclude as viewed by the trial judge. Even if a grand jury had not been sitting at that time the subpoenas could have been continued. But the defendants for their own purposes, preferring to avoid the grand jury itself, opted to go to the post office at a time of their choice. Their decision to take advantage of that convenient option should not justify exclusion on the basis that the grand jury, therefore, was not sufficiently involved. The defendants are themselves in part responsible for the absence of grand jury involvement at that point. We see no constitutional violation; we see no egregious conduct by the government; and we see absolutely no reason or purpose to be served by exclusion of the identification items in the circumstances of this case.

■ The taking and use of the statements of the defendants, however, is a different problem. There is nothing suggested in the trial judge's findings of fact which makes those statements involuntary other than the use of the subpoenas *duces tecum*. The subpoenas did not suggest that any testimony was required, that any defendant had to talk. The explanations and warn-

ings given about constitutional rights should have made it abundantly clear that no statements of any kind were required.

Even if we assume that the government actions were constitutionally illegal,[4] following *Wong Sun,*

> [w]e need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather the apt question in such a case is stated to be "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417–18, *quoting* Maguire, Evidence of Guilt 221 (1959). We are not prepared to hold as a matter of law that the questionable subpoenas alone served to so contaminate the defendants' statements, otherwise voluntarily given in order "to get the problem solved," that those statements should be excluded from the evidence. We see no taint that could rub off these subpoenas onto the statements in these circumstances, but even if the subpoenas had that potential the giving of the statements became so attenuated as to dissipate the taint. *Nardone,* 308 U.S. at 341, 60 S.Ct. at 268.

Among other things there was no arrest, much less an invalid arrest, no illegal search and seizure, no absence of clear constitutional advice, no unnecessary delays, no harassment, no rush or pressure, no denial of right to counsel, no torture, physical or psychological, no mental coercion, no extended police questioning, no promises or false advice, no age disability or mental problems of the defendants, in fact nothing to sustain a holding that the statements were other than voluntary. If the relationship between the subpoenas and the defendants' statements be regarded as purely one of fact, then we hold the trial court's finding to be clearly erroneous. However, we view the relationship in this case to be one more of law than of fact, and conclude that the law does not require all evidence that had any relationship to the subpoenas be suppressed. There was no exploitation of the subpoenas. The statements sufficiently qualify as the product of the exercise of free will by the defendants.[5]

Circuit Rule 18 shall apply.

REVERSED AND REMANDED.

WILLIAM J. CAMPBELL, Senior District Judge, dissenting.

I respectfully dissent from the majority's view and would adopt the reasoning of Judge Shadur.

---

4. The casual handling of the subpoenas by the government creates delays and time consuming arguments. These problems which are easily avoidable serve only to legitimize the attacks upon the grand jury process by its critics who claim the grand jury has degenerated into an abusive tool of the United States Attorney. Our respected and distinguished colleague in this case, Senior Judge Campbell, formerly the United States Attorney in the Northern District of Illinois, and subsequently the Chief Judge of the District Court, is one of the better-known and more forceful, articulate and respected critics whose views command the close attention of us all. In other circumstances, we would expect to agree with him where grand jury abuse is apparent, but this case is not one of those cases.

5. For a current general capsule of grand jury procedures, *see Eleventh Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1980–1981,* 70 Geo.L.J. 465, 565–73 (1981).