Billings, Thomas P., J.
For the following reasons, the defendant’s Motion to Dismiss Indictments, and his Motion to Suppress, are both DENIED.
FACTS
The defendant was indicted on May 20, 2005, on ten counts of fraudulent sale of securities (G.L.c. 110A, §101); ten counts of operating as an unregistered broker-dealer (c. 100A, §201); ten counts of larceny over $250, two of which were from a person over 60 (c. 266, §§30(1) and (5)); and three counts of impeding a tax collector (c. 62C, §73 (h)). As this motion is premised on the manner of the grand jury proceedings, rather than the factual sufficiency of the presentment, the focus here will be more on procedural matters than on the conduct charged.
A. The Subpoenas
In the fall of 2003, three people (an individual and a couple) reported to the Attorney General’s office (“AGO”) that they had given money to the defendant to invest on their behalf, but that he had used it for his own purposes instead.
The case was not immediately brought before a grand jury. The AGO, however, issued four grand jury subpoenas, one to the Beverly Cooperative Bank and three in succession to First National Bank, Ipswich (“FNBI”). Each subpoena sought records of accounts in the name of the defendant or of various aliases and entities controlled by him. The return dates were: November 20, 2003; June 2, 2004; July 7, 2004; and August 11, 2004.
Although an Essex County grand jury was (as always) in session, it was not informed of, and did not vote on, the issuance of any of the subpoenas. Each subpoena was signed by an AGO Financial Investigator and an Assistant Attorney General, and commanded the Keeper of Records to appear in the grand jury for Essex County on a specified day with the records. Each, however, advised the recipient to call the Financial Investigator (whose telephone number was supplied) with any questions, and also that “[a] personal appearance may not be necessary if the documents are delivered on or before” the day before the return date. It appears, unsurprisingly, that each of the banks availed itself of the delivery-in-advance option.
B. The Search Warrants
On June 29, 2004 the AGO applied for warrants to search (a) the defendant’s apartment at Unit 3B, Four Essex Street, Beverly; (b) his “office” (Unit 3A in the same building); and (c) a bank account in his name at FNBI. The 68-page affidavit in support of the application was signed by a state trooper assigned to the AGO, and recounted information gathered by two Financial Investigators (the one who signed the subpoenas, and another) through (a) public records research, (b) interviews of the three individuals who alleged that they had been victimized by the defendant (and who are named in the affidavit), and (c) interviews of three other people (the defendant’s landlord and landlady and an employee of the taxi company he used). Also described was a recent visit by the affiant to Four Essex Street under the pretext of looking for an apartment to rent, in which he briefly encountered the defendant.
The information given in the interviews with the alleged victims, greatly summarized here, was that the defendant had solicited and received low-six-figure amounts each from the individual and the couple, promising to invest it. He supplied statements purporting to indicate where the monies were invested, and the returns. All three investors had eventually lost faith in the defendant and demanded that he return their money, which he failed to do (notwithstanding, in one instance, written promises by a lawyer and a written agreement .to do so). The defendant’s landlord and landlady and the taxi company employee also stated that the defendant had solicited investments from them, but that they had declined.
The defendant did his business with the alleged victims over the telephone, by mail (sometimes using the address One Ellis Square, which is an alternate address for Four Essex Street, and sometimes a different street address that houses a Mailboxes Etc. franchise), and in meetings at a restaurant a quarter-mile away from his home. He did not, in other words, appear to have an office apart from Four Essex Street. When one investor went to the defendant’s apartment with family members to confront him, he took $4,000 in cash from a kitchen cabinet and offered it to her.
The defendant’s landlords described the defendant as “something of a recluse who generally stayed in his apartment,” and did not think he had held a job since they acquired Four Essex Street in March 2000. Finally, when the affiant encountered the defendant in the building on June 24, 2004, the latter stated that he lived in Unit 3B, but was renting Unit 3A temporarily while his own unit was being renovated.
Also related in the affidavit was information gleaned from the subpoenaed records from Beverly Cooperative Bank and FNBI. These supplied corroboration and detail concerning the transactions described by the three alleged victims, and also evidenced deposits by the defendant of checks written by numerous other individuals.
The search warrants were issued the afternoon of June 29, 2004. The searches of Units 3A and 3B yielded documents; the defendant’s savings account at FNBI, slightly over $85,000.
*590 C. The Grand Jury Presentments
The actual presentment of the case to a grand jury began on October 15, 2004. Evidence was taken on that day and on December 3, December 10, and December 17, 2004. This grand jury’s three-month term expired at the end of the year, however, and so the case was re-presented to the grand jury whose term began in January 2005. It was represented at oral argument that a witness summarized, to the second grand jury, the testimony that had been presented to the first. The second grand jury was held over, past the presumptive expiration of its term at the end of March, so that additional testimony could be taken on May 20, 2005. The indictments returned on that day.
The grand juries heard from numerous witnesses, including people who had deposited money with the defendant to invest for them, at least one of the Financial Investigators, and others. Numerous documents produced in response to the bank subpoenas were introduced, one by one, as testimony concerning them was given. Finally, the Assistant Attorney General who presented the case invited the grand jurors, if they wished, to review the subpoenaed documents and the prior grand juiy transcripts, which were present in the grand juiy room.
DISCUSSION
A. Fourth Amendment and Article 14
To the extent that the defendant maintains that the grand juiy subpoenas transgressed rights secured by the Fourth Amendment of the United States Constitution or Article 14 of the Declaration of Rights, the argument is foreclosed by Commonwealth v. Cote, 407 Mass. 827, 832 (1990). There, the SJC held that a grand juiy subpoena directed to the defendant’s telephone answering service, although improper for other reasons (see Part B, below), did not violate the Fourth Amendment or Article 14 because the defendant had no reasonable expectation of privacy in records maintained by a third party.
In so holding, the court relied on United States v. Miller, 425 U.S. 435 (1976). In Miller, the United States Supreme Court declined to suppress bank records obtained by the government in response to trial subpoenas. It reasoned that the defendant had no protectible expectation of privacy in his bank’s records of his account, since “(t]he depositor takes the risk, in revealing his affairs to another [i.e., the bank], that the information will be conveyed by that person to the Government.” 425 U.S. at 443.
The defendant argues — correctly, in part — that the Miller case was legislatively overruled by the subsequent passage of the federal Right to Financial Privacy Act (“RFPA”), 12 U.S.C. §3401 et seq. and, in the Commonwealth, of G.L.c. 167B, §16. The RFPA was indeed passed in response to the Miller decision, and prescribes the means by which bank records may be obtained by a “Government authority.” The RFPA defines this term, however, to refer only to an “agency or department of the United States, or any officer, employee, or agent thereof’; it does not apply to subpoenas by a state law enforcement authority.[1]
G.L.c. 167B, §16 does apply to disclosure of bank records generally, but expressly permits such disclosure “pursuant to a court order or lawful subpoena.” In other words: neither the state or federal constitution, nor the cited state and federal statutes protecting the confidentiality of bank records, required that the Commonwealth obtain the records pursuant to a search warrant, issued on a finding of probable cause by a neutral magistrate.
B. Separation of Powers
Nonetheless, there are limits on the Commonwealth’s use of the grand juiy subpoena power. Both state and federal cases, in delineating the difference between the proper and improper issuance of grand juiy subpoenas, have stressed “the need for the strict separation of the grand juiy’s investigatoiy function and the [prosecutor’s] prosecutorial function.” Cote, 407 Mass. at 832; see United States v. Sells Engineering, 463 U.S. 418, 430 (1983); United States v. Melvin, 546 F.2d 1, 6 (1st Cir. 1976). The need to preserve and respect this separation makes it improper, for example, for a prosecuting authority to use grand juiy process in order to prepare an already indicted case for trial, Commonwealth v. Liebman, 379 Mass. 671, 677 (1980), or otherwise without any intention of using, in the grand jury, the evidence obtained in response to the subpoena. Prosecutors “should limit use of grand juiy subpoenas to situations which further the grand juiy’s function.” Cote, 407 Mass. at 832 (finding improper a prosecutor’s issuance of a grand jury subpoena duces tecum, without then presenting the records to the grand jury).
No Massachusetts precedent called to the Court’s attention directly addresses the propriety of the procedure employed here: the issuance of a grand jury subpoena duces tecum, (a) without the grand juiy’s knowledge or authorization, (b) returnable on a day the grand juiy is in session but (c) not pertaining to any matter yet the subject of a grand jury presentment or investigation, (d) with the recordholder being given the option to deliver the records directly to the prosecutor in lieu of appearing in the grand jury, and (e) the records being presented much later, to a different grand jury than was sitting at the time of the subpoena, (f) after their examination and analysis by investigators working with the prosecution.
There are, however, federal cases on point. These have generally been willing to accord prosecutors considerable leeway in how they manage the administrative details of gathering and presenting evidence, provided always that the authority of a grand juiy subpoena is to be used only in connection with a matter being presented — or to be presented — to a grand juiy.
*591 In the oft-cited case of United States v. Kleen Laundry & Cleaners, Inc., 381 F.Sup. 519 (E.D.N.Y. 1974; Weinstein, J.), for example,
the United States Attorney’s office obtained defendants’ books and records through the use of a subpoena issued in the name of a grand jury not in session but expected to be sitting on the return date. The grand jury was neither consulted nor notified. The books and records, instead of being surrendered to a grand jury, were accepted by an Assistant United States Attorney and used by the government in further investigation. Eighteen months later the Assistant finally delivered the documents to one of the grand juries which had been sitting [at the time the subpoena was issued).
381 F.Sup. at 520.
The court declined, on these facts, to dismiss the indictments or to hold that the grand jury process had been misused. It described in some detail the prosecutor’s accustomed “leadership role” in assembling and presenting evidence to the grand jury, 381 F.Sup. at 521, and accepted this role as a necessary aspect of modern law enforcement.[2] Specifically, the court held that neither the government’s issuance of a grand jury subpoena duces tecum without a grand jury’s knowledge or authorization, nor its direction that the records be delivered to the prosecutor rather than to the grand jury, nor the use of those records by government agents for further investigation before the case was presented, was improper. Nor was it of concern that no grand jury was even sitting on the date the subpoena issued, so long as the return was set for a day when the grand jury was normally in session. This last point was made “[b]y a parity of reasoning” with cases that have held that a subpoena may issue on the authority of a different grand jury from the one to which the evidence ultimately is presented. 381 F.Sup. at 523.
One commentator has stated the rule succinctly, as follows:
Government attorneys engaged in grand jury investigations properly may have subpoenas issued without the grand jury’s authorization or awareness to compel attendance of witnesses before the grand jury, but they may not use the grand jury subpoena power to gather information without the intended participation of the grand jury.
Holderman, “Preindictment Prosecutorial Conduct in the Federal System,” 71 J.Crim.L&C 1, 7 (1980), quoted with approval in United States v. Santucci, 674 F.2d 624, 627 (7th Cir. 1982), cert. denied, 459 U.S. 1109 (1983); accord, Doe v. DeGenova, 779 F.2d 74, 80 (D.C.Cir. 1985). This is precisely the same line — between use of the grand jury’s authority to gather evidence for use in the grand jury, and its use for trial or other purposes — as the SJC drew in the Liebman and Cote cases.[3]
In the case before me, the line was not crossed. There is no suggestion, and no reason to assume, that the AGO did not intend, at the time it served the subpoenas, to present the requested records to a grand jury at some point. In fact, they were so presented (along with considerable other evidence), the result being the very indictments the defendant now seeks to have dismissed. The subpoenas, though issued independently by a prosecutorial authority, properly invoked the grand jury’s authority in furtherance of the grand jury’s business, and none other.
C. Absence of Prejudice
Even had the subpoenas been improperly issued, moreover, as they were in Cote and Liebman, those cases hold that the defendant would not be entitled to relief absent some showing of prejudice. Cf. also Commonwealth v. Smallwood, 379 Mass. 878, 887-88 (1980) (declining, in the absence of prejudice, to order relief for Commonwealth’s improper use of trial subpoenas to summons witnesses to interviews on days when trial was not in session).
The defendant has shown no prejudice in the issuance of the search warrant. The search warrant affidavit sets forth adequate probable cause to search Units 3A and 3B of Four Essex Street, Beverly, even without reliance upon the subpoenaed records, because the other information set forth from named citizen informants and other sources provided probable cause to believe “that the items sought [we]re related to the criminal activity under investigation, and that they reasonably [could] be expected to be located in the place to be searched at the time the search warrant issue[d].” Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). The search warrant application thus stands on its own without reference to the subpoenaed documents, making suppression an inappropriate remedy even if the subpoenas were improper. Cf. Franks v. Delaware, 438 U.S. 154, 156 (1978) (evidence seized pursuant to warrant procured by perjured affidavit need not be suppressed, if the non-perjured portions of the affidavit supplied probable cause to search).
Nor does the defendant appear to contend that the subpoenaed bank records and the information derived from them made a material difference in the grand jury’s decision to indict. Although the motion papers do not attach the grand jury minutes in their entirety, such excerpts as were submitted show that the presentment relied in substantial part on testimony of percipient witnesses (some of the alleged victims, and others). Whether or not these witnesses, and whatever documents were obtained in the search or other means apart from the subpoenas, established probable cause as to all ten alleged victims to whom the indictments pertain cannot be told from the materials before me. In the absence of a showing that a presentment failed to establish probable cause apart from the bank records, there would be no ground for dismissal *592 of the indictments (even assuming, again, the impropriety of the subpoenas). Cote, 407 Mass. at 833.
****
The bottom line, however, is that the AGO issued the four grand jury subpoenas with the intention of using the requested bank records in connection with a presentment to a grand jury. It actually did so use the records, and there is no evidence that the records were used for any improper purpose. It follows that the subpoenas were properly issued, and there is therefore no ground for suppression of the evidence so obtained, or dismissal of the indictments.
ORDER
For the foregoing reasons, the defendant’s Motion to Dismiss Indictments, and his Motion to Suppress, are both DENIED.

In 12 U.S.C. 3420, moreover, the RFPA permits disclosure of bank records “pursuant to a subpoena issued under the authority of a Federal grand jury,” with limitations addressed generally to ensuring that grand jury subpoenas will be used for grand jury purposes. Section 3413(i) provides that certain procedures mandated for other subpoenas — notably, advance service on the depositor, who may move to quash the subpoena, see §3407 — do not apply to grand jury subpoenas.

This acceptance did not, however, prevent a note of wistfulness from creeping into the district court’s discussion. In Judge Weinstein’s words:
Time and precedent have not been kind to the grand jury. The institution once had primary responsibility for the discovery and reporting of crime. As local citizens familiar with local conditions, grand jurors were able to report to the itinerant judges of the King’s central court system as they made their rounds. The framers of the Constitution expressed their regard for the grand jury with the Fifth Amendment, which provides:
“No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . .”
Today the grand jury’s independence in the criminal justice system has declined with the increasing complexity of crime and the growth of the role of prosecutors, professional police and investigative forces.
381 F.Sup. at 521 (citations omitted). Accord, United States v. Sells Engineering, 463 U.S. 418, 430 (1983).

For cases in which the prosecution was held to have used the grand jury subpoena power for ulterior purposes see, e.g., In re Grand Jury Proceedings (Schofield), 246 F.2d 85 (3d Cir. 1973) (reversing a finding that witness was in contempt for failing to provide handwriting exemplar in response to grand jury subpoena, where exemplar was not shown to be relevant to any matter being investigated by grand jury and within its jurisdiction), and Durbin v. United States, 221 F.2d 250 (D.C. Cir. 1954) (grand jury subpoena employed to compel witness to submit to interview without ever testifying to grand jury: “It was clearly an improper use of the District Court’s process for the Assistant United States Attorney to issue a grand jury subpoena for the purpose of conducting hrs own inquisition”); accord, United States v. DeGilio, 538 F.2d 972, 985 (3d Cir. 1976).