**UNITED STATES of America, Plaintiff,**

v.

**Anthony SANTUCCI, et al., Defendants.**

**No. 80 CR 349.**

United States District Court,
N. D. Illinois, E. D.

March 2, 1981.

178

Thomas P. Sullivan, U. S. Atty., Ann C. Williams, Phillip A. Turner, Asst. U. S. Attys., Chicago, Ill., for plaintiff.

Stephen J. Knorr, Robert A. Korenkiewicz, Elliot Samuels, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On December 30, 1980 this Court, for reasons stated in its Memorandum Opinion and Order of that date (the "Opinion"), 504 F.Supp. 1072 granted motions to suppress filed by defendants Loster Avery ("Avery") and Joseph Cook ("Cook") directed at statements and handwriting exemplars given by each to United States Postal Inspectors.* Two motions are now before the Court:

1. Defendant Anthony Santucci ("Santucci") and the government have moved jointly for a ruling on Santucci's motion to suppress without a hearing, based on their stipulation as to factual issues.

2. Reconsideration of the Opinion has been moved by the government.

For the reasons stated in this memorandum opinion and order this Court:

1. determines that the Santucci motion to suppress poses issues substantially identical to those dealt with in the Opinion, so

---

* All the facts as to Avery and Cook, on which the Opinion and this opinion are based, have been stated in the Opinion and will not be repeated here.

that the decision of that motion is controlled by the principles stated in the Opinion; and

2. denies the government's motion to reconsider the Opinion.

### Defendant Santucci's Motion To Suppress

■ As with Avery and Cook, grand jury subpoenas directed to Santucci (in his case dated July 16, 1976) were obtained by Postal Inspectors Bishop and Tomaino from AUSA Reidy, issued under the claimed authority of the July 1976 grand jury but without specific grand jury authority. Neither the Postal Inspectors, AUSA Reidy nor anyone else appeared before the grand jury for the purpose of obtaining subpoenas.

Again paralleling the Avery-Cook sequence of events (except for the closer proximity of the date of service and return date of the subpoenas to the date of Santucci's appearance), the Postal Inspectors served Santucci between July 27, 1976 and August 2, 1976 with a subpoena bearing an August 3, 1976 return date. According to the Postal Inspectors (and although Santucci was unclear on this score, his conduct was consistent with the Postal Inspectors' position), they advised Santucci that he was to appear before the grand jury to provide handwriting samples and fingerprints or, at his option, could come to the Post Office for that purpose.[1]

On August 4, 1976 Santucci appeared at the Post Office, apparently having telephoned the Postal Inspectors to say that he would do so. Again as with Avery and Cook, the Postal Inspectors have stated that Santucci was immediately advised of his rights and stated he understood them, signed a warning and waiver of rights form (which is in evidence) and was advised that he was not under arrest and could leave at any time.

Santucci's appearances at the Post Office, covering a two-day period, resulted in fingerprinting, handwriting exemplars and a written statement. All are the subject of Santucci's motion to suppress.[2] As indicated by this brief factual outline, the Santucci evidence is governed by the same legal principles as the corresponding evidence obtained from Avery and Cook and discussed in the original Opinion and this opinion.

### Reconsideration of the Opinion

It is most distressing to observe from the government's motion for reconsideration that it does not yet appear to recognize just what is and what is not involved in this case. Indeed the government's memoranda are written as though it were seeking to preserve some fundamental principle rather than to serve the mere administrative convenience of Assistant United States Attorneys and Postal Inspectors at the possible expense of defendants' Fourth and Fifth Amendment rights.

All of us recognize that we indulge some fictions in the use of subpoenas, as the government points out. Though the issuance of trial subpoenas ultimately rests upon the power of the court, signed blank subpoenas are made freely available to private counsel to summon witnesses to testify without court authorization or knowledge. But such amiable fictions do not themselves implicate constitutional rights, and anyone who claims infringement of such rights can always apply to the courts for relief.

■ Our Bill of Rights represented a deliberate decision by the Founding Fathers, stemming from past governmental abuses, to incorporate into the fabric of the govern-

---

1. Santucci's deposition testimony (Tr. 66) was that if he did not appear "I was under arrest, or something to that effect." Santucci felt that he was compelled to go to the Post Office Building, and he complied (Tr. 68), believing that he had no choice in that respect (Tr. 98).

2. This Court has been provided with a truncated version of the Santucci deposition (taken in Arizona, where Santucci resides, because his health would not permit traveling to Chicago for that purpose) and exhibits. Accordingly the Court does not have all of the facts regarding another statement, apparently given by Santucci April 8, 1976, when he was visited by Postal Inspectors at the liquor store where he worked. This opinion does not deal with the admissibility of that statement.

mental charter itself protections too important to permit future legislative or judicial change. For that reason the Fifth Amendment, encompassing the broadest collection of the fundamental procedural rights afforded criminal defendants (in addition to the due process and just compensation provisions applicable to civil proceedings), *begins* with the grand jury:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury....

To assist it in performing its historical functions, the grand jury is vested with broad powers, in which for example its subpoenas to testify are considered "not that kind of governmental intrusion on privacy against which the Fourth Amendment affords protection, once the Fifth Amendment is satisfied." *Fraser v. United States*, 452 F.2d 616, 620 (7th Cir. 1971).

■ When we make use of fictions as a concession to expediency in the context of the grand jury, it is therefore *doubly* necessary that we not infringe on other equally fundamental rights. Although the realities of life may be that the United States Attorney must be the catalyst for and orchestrator of grand jury action, the grand jury cannot be made simply the investigative tool of the United States Attorney. *That* is the problem this case presents.

■ Thus the Opinion in this case does *not* challenge the general proposition that the *grand jury* can by subpoena require an individual to provide handwriting exemplars, photographs and fingerprints. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). This Court's Opinion does *not* challenge the proposition that the *grand jury* can provide in its subpoenas that the prospective witness has the option to provide the subpoenaed evidence outside

the presence of the grand jury—a desirable practice given the "chaotic" results that might otherwise obtain. *United States v. Edwin Duncan*, 598 F.2d 839, 867 (4th Cir. 1979). This Court's Opinion does *not* challenge the proposition that to serve the grand jury in exercising its own powers, the United States Attorney may fill in blank subpoenas requiring the provision of handwriting exemplars, fingerprints and photographs without prior grand jury approval.[3]

But the attempted combination of these last two propositions, so that the grand jury is bypassed entirely and the subpoenas become an investigative tool of the United States Attorney without *any* grand jury involvement, is obviously not understood by the government as posing a difference—and a fatal one in constitutional terms. Thus it is ironic to find the government quoting in support of its position (Reconsideration Memorandum 2 and Reply Memorandum 5–9) *In re Melvin*, 546 F.2d 1, 5 (1st Cir. 1976). What the government has done is to stop its quotation of that opinion, which confirms that the United States Attorney may fill in blank subpoenas and serve witnesses without consulting the grand jury, immediately before the First Circuit went on to state the holding with which this Court concurred in writing the Opinion (emphasis added):

> Still, he [the United States Attorney] may *not* use his subpoena powers under Rule 17 to gather evidence *without the participation of the grand jury*.

In its Reply Memorandum 8, the government does quote the entire passage, but it underscores the *preceding* sentence (which states the non-issue) and not the *critical* sentence (which controls here).[4]

It should be unnecessary to restate the applicability of *In re Melvin, United States*

---

**3.** It is truly astonishing, in light of the Opinion, that the government's reply memorandum persists in its misperception of the real issues by devoting *16 pages* to setting up and then painstakingly knocking down a straw man (quoting the government's heading): "The United States Attorney Can Issue Subpoenas Without Any Grand Jury Participation." In the classic phrase (at least among movie buffs) from *Cool Hand Luke*, "What we have here is a failure to communicate."

**4.** Neither does the government in its memoranda refer to the compelling language from *Durbin v. United States*, 221 F.2d 520, 522 (D.C.Cir. 1954), quoted and relied on in *Melvin*.

*v. O'Kane* [D.C., 439 F.Supp. 211] and the other cases relied upon in the Opinion (though the fact that the government actually cites and quotes from those cases in its reconsideration memoranda gives the Court some pause on that score). Nor should it be necessary to repeat the Court's explanation in the Opinion of why Judge Weinstein's opinion in *Kleen Laundry* [D.C., 381 F.Supp. 519] supports rather than vitiating the force of this Court's decision (though again the government's re-citation and extended parsing of *Kleen Laundry* indicates that this Court's discussion at Opinion 182 had failed in communicating that message). Instead the Court will deal, to the extent necessary, with the other authorities the government seeks to adduce in support of its position, authorities that were not initially urged for that purpose.

There appears to be good reason for the government's prior failure to cite *United States v. John Duncan*, 570 F.2d 292 (9th Cir. 1978) and *United States v. Edwin Duncan*, 598 F.2d 839, 867 (4th Cir. 1979). In each of those cases there is no consideration or discussion of the question before this Court. In each there is nothing to indicate that the subpoenas were issued without grand jury involvement. In *John Duncan* the question was whether the procedure followed by the grand jury had violated a statute requiring *judicial* consent before a juvenile's fingerprint was taken. In *Edwin Duncan* all that was questioned was whether the grand jury's subpoena could contain a provision that delivery of the documents could be made to the FBI. To repeat, absent any indication that the grand jury had been bypassed as in our case, and certainly absent any discussion of that issue, nothing in either *Duncan* decision requires any change in the Opinion.

At the District Court level, *Robert Hawthorne, Inc. v. Director of Internal Revenue,* 406 F.Supp. 1098 (E.D.Pa.1976) includes an extended discussion of grand jury procedures by Judge Becker. Though *Hawthorne* deals at length with the other matters this opinion has said are *not* challenged by the prior Opinion of this Court, it does not deal directly with the proposition at issue here (it may also be noted that Judge Becker pointed out the lesser degree of Fourth and Fifth Amendment protection afforded to a *corporation*, which was the complaining party involved in *Hawthorne*, 406 F.Supp. at 1117 n.32). As for Judge McGarr's opinion in *United States v. Franklin*, 77 CR 556, *aff'd by unpublished order*, 582 F.2d 1282 (7th Cir. 1978), the difference there (as was also true in *Edwin Duncan* ) is that Judge McGarr held the defendant's appearance and production at the Post Office to have been *voluntary*,[5] while this Court holds under the facts of this case that the appearances and provision of evidence by each of the defendants was *involuntary* —under compulsion of law represented by the subpoenas.

Nothing in the government's motion for reconsideration has caused this Court to modify its views on the substance of the suppression motion, as expressed in the Opinion. Accordingly this opinion will deal briefly with the other two points made by the government.

First the government argues that even if the materials were obtained in violation of defendants' constitutional rights, they should not be suppressed because the government can obtain the same materials "legitimately" anyway. *United States v. Rowell*, 612 F.2d 1176 (7th Cir. 1980) stands for that proposition where the prior illegal conduct was that of *state* not *federal* officials. Thus the "deterrent purpose underlying the exclusionary rule" (612 F.2d at 1179) did not preclude admission of the evidence the federal government could obtain

---

**5.** Judge McGarr determined that Franklin acted wholly on his own, without reference to the expired subpoena:

> Here, I think we have to regard the case, very simply, as one of a man coming in off the street to the Postal Inspectors. . . . Because of the long passage of time and the fact that Mr.

Franklin had ignored the subpoena and had not reported on the return date to the Grand Jury, for some considerable period thereafter, I don't think that subpoena was precisely what brought him into the Post Office.

This Court has made precisely the opposite finding as to the defendants here.

legitimately in any case. Similarly, *Stevenson v. Matthews*, 529 F.2d 61, 63 (7th Cir. 1976), on which the government also seeks to rely, underscores the indirectness of any connection between the illegal governmental conduct and the consequences of that conduct sought to be taken advantage of by the government. Under the circumstances this Court views as controlling the principles of *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), where the nexus between the illegal conduct and its fruits was so close as to invoke "the deterrent purposes of the exclusionary rule" (529 F.2d at 63). Because the present case similarly involves a direct cause-and-effect relationship between the improper use of the grand jury subpoenas and the evidence obtained through such use, it is *Davis* and not *Rowell* or *Stevenson* that applies here.[6]

■ Indeed our Court of Appeals, in properly distinguishing *Davis v. Mississippi* from the facts before the Court in *Stevenson*, invoked *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)—the same case to which this Court's original Opinion referred in dealing with the problem of the Avery and Cook statements. Thus the same principles operate to reject the second and related branch of the government's argument: that even if the appearances at the Post Office were involuntary, the taint does not bar admission of defendants' statements. When the Court posed that question to the government at the conclusion of the initial hearing, the government confirmed that the *Wong Sun* "fruit of the poisonous tree" principle was controlling (371 U.S. at 487–88, 83 S.Ct. at 417). None of the authorities now cited by the government attenuates the force of *Wong Sun* by demonstrating that the connection between the government's illegal conduct and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267,

84 L.Ed. 307 (1930). Here too this Court has made a factual determination that no such attenuation has dissipated the taint of the illegal conduct.

■ In its reply memorandum the government urges that the good faith of the Assistant United States Attorney involved in the issuance of the subpoenas should prevent suppression even if his official conduct were illegal. In support of that argument the government cites and quotes from a number of recent decisions either questioning or limiting the exclusionary rule as it applies to good faith errors by arresting or searching officers.

It is hardly news that there is much restiveness within the federal judiciary, reaching to our highest court, as to the purposes and functions of the exclusionary rule in that context. All of us are aware of the problems it poses to the policemen who must act on the firing line (unfortunately too often literally so) and under the need to make immediate law enforcement decisions without the luxury of deliberation. Most recently the Fifth Circuit laid down a new exclusionary rule standard for its District Courts in an en banc decision, *United States v. Williams*, 622 F.2d 830 (5th Cir. 1980). Drawing on that same restiveness, the government's memorandum stresses a group of Supreme Court decisions, of which *Michigan v. Tucker*, 417 U.S. 433, 446, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 433 (1974) is typical:

> The pressures of law enforcement and the vagaries of human nature would make such an expectation [that policemen investigating serious crimes make no errors whatsoever] unrealistic.

This Court will not now enter that policy debate, where the problems just identified are sought to be weighed against the deterrent effect of the exclusionary rule in encouraging lawful conduct by police officers.[7] But it would remind the government

---

6. None of the parties has really dealt fully with the manner in which the government might otherwise obtain fingerprints and handwriting exemplars from defendants, or with the legal

consequences of so doing. Accordingly this opinion leaves those questions for another day.

7. As the Supreme Court stated the exclusionary rule's rationale in refusing to extend it to

that all the cases on which it relies deal with policemen in the field, *not* with the United States Attorney in his office. What are the "pressures of law enforcement and the vagaries of human nature" that should lead us to apply the same standards to the United States Attorney engaged in the carefully-planned preparation and presentation of a case to the grand jury? If this Court is being asked to engage in a balancing-of-interests test in *that* context—and it does not believe that it needs to in deciding this case—it finds that there is no contest. Fourth and Fifth Amendment rights of defendants must weigh far heavier in the scales than a claim of good faith error by the prosecutor, who has merely made a decision of administrative convenience not to involve the grand jury in the gathering of this kind of evidence with the use of the grand jury's own subpoenas.[8]

### Conclusion

No reason has been shown for this Court to desert the factual findings and legal principles announced in its Opinion. All of the challenged materials provided by defendants Avery, Cook and Santucci must be suppressed, and the motion of each defendant to that effect must be granted.

proceedings of the *grand jury itself, United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974) (citations omitted):

> Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures:
> The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it. *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).
> . . . . In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its de-

terrent effect, rather than a personal constitutional right of the party aggrieved.
A fortiori the rule should serve to deter unlawful United States Attorney's conduct.

8. After this opinion was in final form, the government moved to supplement the record with affidavits of AUSA Reidy and Postal Inspectors Bishop and Tomaino establishing their good faith in following the procedures held by this Court to violate defendants' constitutional rights. This Court grants that motion. It has indeed assumed the existence of "good faith" in that sense. But the government will not be permitted to lift itself by its own bootstraps by establishing impermissible procedures and then arguing it has followed those procedures in "good faith."