UNITED STATES of America, Plaintiff,

v.

Robert WHITE, Defendant.

No. 81 CR 673.

United States District Court,
N. D. Illinois, E. D.

June 9, 1982.

Victoria Meyers, Ira H. Raphaelson, Asst. U. S. Attys., Chicago, Ill., for the U. S.

Carol R. Thigpen, Bradford P. Lyerla, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Robert L. White ("White") has been indicted for mail and wire fraud in the operation of his sole proprietorship, Robert L. White & Co. ("White & Co."). White challenges the seizure by federal postal inspectors of White & Co. records from his offices at 28 East Jackson Boulevard, Chicago. Though the seizure followed a search pursuant to a warrant, White claims both search and seizure violated his Fourth Amendment rights. For the reasons stated in this memorandum opinion and order, White's motion to suppress is granted.

### FACTS[1]

There is a sharp dispute as to the bona fides of White & Co.:

(1) White says he is a legitimate manufacturer's representative and whole-sale distributor for small manufacturers.

(2) According to the government, White's operation is a " 'scam' business, an illegal operation which falsely induces merchants to ship goods which the 'scam' operator never intends to pay for."

This opinion need not however resolve which of those competing versions is accurate.

In mid-December 1980 White entered into an oral lease[2] of Room 608 at 28 East Jackson to conduct the White & Co. business. White took possession of the premises just before January 1, 1981.[3]

By March 16 White was substantially delinquent in his rent, having paid only $250 and owing another $1495. On that date building manager Provine changed the locks on Room 608 to bar White's reentry.

Provine testified she tried unsuccessfully to reach White before locking him out. Though she had never specifically discussed reentry or legal rights with White, she would have restored the premises to White on payment of the back rent. Provine had done so with other tenants.[4] Provine also testified it was a building policy in "lockouts" like White's to keep the tenant's personalty and not let anyone else rummage through it.

Finally Provine (like postal inspector Cooper) testified White had a display of some items for sale in the outer "public" portion of the office. However, the materials actually seized were *not* in plain view from that "public" part of the office.

On April 15 postal inspector Cooper applied to Magistrate Olga Jurco for a search warrant covering White's office. Cooper's

---

1. This section reflects the Court's findings of fact following its evidentiary hearing on White's motion.

2. Building manager Irene Provine ("Provine") did give White written lease forms, but they were never signed.

3. All dates without any year designation are 1981 dates.

4. Indeed Jan Cooper ("Cooper"), the federal postal inspector who directed the search of White's office, testified Provine told him White would be permitted to reenter the premises if he paid the rent. White himself testified he believed his property would be held for him and he would get it back if and when he paid rent. White also stated his belief no one would have access to his belongings in Room 608.

affidavit in support of the application contained information indicating White had used the mails to submit false credit information to American Candy Co. and Armour-Dial Co. Magistrate Jurco issued a warrant authorizing the government to search White's office and to seize "all books, records and merchandise which are fruits, evidence and instrumentalities of violation of [the mail fraud statute]."

Cooper and a fellow inspector promptly executed the warrant by serving it on Provine, who let them into Room 608.[5] They then seized virtually all White & Co. records. In addition, they seized a number of items that were not literally "books, records and merchandise" of White & Co., such as a telephone, a sign with the company name on it, blank checkbooks, two rubber stamps, pens, pencils, a cassette tape, two rounds of .357 ammunition, a newspaper obituary and a rough draft application for a passport.

### White's Privacy Expectations

White objects that the search and seizure were made pursuant to an impermissibly broad and vague warrant in Fourth Amendment terms. But before that issue can be reached, White must surmount a preliminary hurdle. To invoke Fourth Amendment protection he must prove a legitimate expectation of privacy both in the area searched and in the property seized. *United States v. Rakas*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 432–433, 58 L.Ed.2d 387 (1978); *United States v. Salvucci*, 448 U.S. 83, 93, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980).

There is no dispute on the second of those questions—White's expectation as to the property seized. Rather the government contends White did not have a legitimate expectation of privacy in the *area* searched—Room 608. That argument is unpersuasive.

*Rakas,* 439 U.S. at 143–44 n.12, 99 S.Ct. at 430–431 n.12, states the operative test. For White to have had a legitimate privacy expectation in Room 608:

(1) He must have had an actual *subjective* expectation of privacy in the premises searched.

(2) That expectation must be one society can recognize as reasonable or legitimate. See *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

White's subjective mind-set is of course confirmed by his own testimony[6] and, more importantly, is supported by that of Provine and Cooper as well. White testified he believed Provine would prevent others from having access to Room 608 and White's belongings there, and White would be permitted to reenter and run his business out of Room 608 if he paid the past due rent. Provine confirmed White's stated beliefs were accurate. In fact, Cooper's statement of what Provine told him (see n.4) is corroborative of a material part of White's testimony (that about reentry).[7]

This Court finds, as a logical inference from the testimony, that White *did* expect

---

**5.** Cooper testified he had spoken to Provine April 14, the day before the warrant issued. Provine then told him no one had entered Room 608 since she had locked out White, and she said she would let Cooper and an associate into Room 608 (Provine testified to the contrary). Cooper said he declined Provine's offer and obtained a warrant instead. Cooper then presented the warrant to Provine, who took him to Room 608 where he "looked around" and then "left." On his next visit Cooper brought other agents with him, and the search that is the subject of this motion took place.

**6.** Because the first element is subjective, the inevitable self-serving statement is of little value. Instead, a court must focus on whether any available objective evidence does or does not square with the self-declaration.

**7.** Provine did say she would not have permitted Cooper to enter without a search warrant, while Cooper testified (see n.5) to the contrary. Provine's version would buttress White's own expectation of privacy, while even Cooper's—claiming a lay person's willingness to give special permission to law enforcement authorities—would not really impair the general validity of White's understanding.

subjectively that others would not be given access to Room 608 so as to violate White's privacy in the *Rakas* sense.[8] Unable to counter with any direct evidence, the government claims White's behavior was inconsistent with a belief that Room 608 was "private": White did not sign a lease, did not pay the required security deposit and rent when due, and did not pay the back rent or otherwise seek to regain possession of Suite 608. From that conduct the government reasons White "treated the oral lease as terminated as of the March lock out."

Though the government's facts are right, its conclusions are flawed. All White's cited behavior demonstrates his *inability* to pay the rent (White said that was due to accident and illness). It does not show he ceased to *expect* the premises (and his personalty inside them) would remain private. As already stated, the Court resolves this fact issue in White's favor.

■ That leads to a somewhat more difficult question: whether the law is prepared to recognize White's expectation of privacy in Room 608 as "reasonable" or "legitimate." Although state law is not entirely dispositive on this matter,[9] it cuts strongly in White's favor. *Brooks v. LaSalle National Bank*, 11 Ill.App.3d 791, 797, 298 N.E.2d 262, 267 (1st Dist. 1973) indicated a lessor must resort to judicial proceedings both to regain possession of the premises[10] and to distrain a lessee's personalty upon default in rental payments. Under Illinois law Provine's exercise of self-help thus violated White's rights, and he remained entitled to possession of the premises.

■ More than the technicality of White's *legal* entitlement, however, shows his expectation was legitimate. After all, a tenant's interest in his leasehold is the archetype of a legitimate privacy interest. Surely we cannot sacrifice the tenant's Fourth Amendment rights because of his landlord's wrongful retaking of the tenant's property. *United States v. Botelho*, 360 F.Supp. 620, 624–26 (D.Hawaii 1973); *State v. Taggart*, 7 Or.App. 479, 483–84, 491 P.2d 1187, 1189 (1971).

Nor is that underlying policy altered by White's having fallen into arrears on his rent soon after taking possession. It is enough to "legitimate" White's expectation for Fourth Amendment purposes that he did take possession of the premises under a valid lease, did move important business materials into Room 608 and was never *lawfully* ousted of his legal entitlement to the premises. "Legitimacy" cannot fairly be measured in degrees, in terms of such factors as how long the tenant was in uninterrupted possession or whether the premises were used for residential or for business purposes. No such rule would be sufficiently protective of tenants' rights against unreasonable searches and seizures.

Moreover, in this case the general principles mirror specific facts. There were clear understandings on the part of both landlord (via Provine) and tenant as to (1) White's right to retake possession (despite the wrongful dispossession) on payment of the rent and (2) maintenance of the integrity of White's property in the interim. White had a legitimate right to rely on those understandings—and that post-lockout right wholly differentiates this case from *United States v. Buchanan*, 633 F.2d 423, 426 (5th Cir. 1980):

**8.** Provine said she would have shown the premises to a prospective tenant while White was still delinquent in rent. There was no evidence White was aware of that possibility. But even had he been, that kind of escorted showing (which Provine made clear would preserve the integrity of White's belongings) would not negate White's expectations of privacy in the premises as they related to his property.

**9.** *Rakas*, 439 U.S. at 143, 99 S.Ct. at 430; *Salvucci*, 448 U.S. at 91–92, 100 S.Ct. at 2552–

2553; *Rawlings*, 448 U.S. at 105–06, 100 S.Ct. at 2561–2562.

**10.** In fact the holding in *Brooks* was that a lease provision permitting a lessor's forcible entry was not necessarily a complete defense (because the lessee had secured a temporary injunction, the question was whether he had a probability of ultimate success on the merits). But the court's analysis left no doubt as to which side of the self-help question it would embrace.

On April 15, Buchanan had failed to pay the monthly rent for the searched premises. The lease expired by its own terms five days after the non-payment of rent. On May 5, 1979, the landlord changed the locks on the doors of the premises. Since Buchanan had no further property interest in the premises once the lease had expired, and since he was not present at the premises when they were searched, he had no legitimate expectation of privacy in the premises and thus no standing to challenge the search.

By total contrast, White did retain his expectation of privacy in Room 608, and that expectation was legitimate.[11] It thus remains to consider whether the Fourth Amendment, on which he has the right to call, is responsive to his invocation.

### Validity of the Search Warrant

White objects to the search warrant on two closely-linked grounds:

(1) It did not describe the objects to be seized with enough specificity to survive Fourth Amendment scrutiny.

(2) No probable cause existed to support issuance of a warrant of such breadth.

Because both those interrelated contentions are persuasive, (and either would be sufficient), White's motion to suppress must be granted and his personal property returned.

Two recent decisions of the Court of Appeals for the First Circuit strongly support White's position. In *United States v. Roche*, 614 F.2d 6 (1st Cir. 1980) the government had probable cause to believe defendant was engaged in a fraudulent scheme to charge excessive premiums for motor vehicle insurance. As here, the warrant authorized seizure of all items at defendant's office that could be "evidence, fruits and instrumentalities" of mail fraud violations. Suppression of the seized evidence was upheld on both grounds urged here by White, 614 F.2d at 7:

"... Here, at a minimum, the precise nature of the fraud and conspiracy offenses for evidence of which the search was authorized ... needed to be stated in order to delimit the broad categories of documentary material and thus to meet the particularity requirement of the fourth amendment." [quoting *In Application of Lafayette Academy*, 610 F.2d 1, 3 (1st Cir. 1979)].

Here, the government could have limited the objects of search and seizure to documents and records pertaining to automobile insurance, but declined to do so. This impermissibly broadened the scope of the search beyond the foundation of probable cause.

Both the "particularity" and "excessive scope" rationales of *Roche* and *Lafayette Academy* apply to condemn the warrant in this case. It authorized a search for and a seizure of "all books, records and merchandise which are fruits, evidence and instrumentalities of violation of [the mail fraud statute]."

■ As to the "particularity" requirement identified in *Roche* and *Lafayette Academy*, the standard was put succinctly in *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927):

As to what is taken, nothing is left to the discretion of the officer executing the warrant.

But here nothing in the warrant itself hedged the exercise of the inspectors' discretion. Nor was the supporting affidavit either attached to the warrant, incorporated into the warrant by reference or presented to Provine so as to save the "unparticular" warrant. *Roche*, 614 F.2d at 8; *Lafayette Academy*, 610 F.2d at 4; *Klein v. United States*, 565 F.2d 183, 186 n.3 (1st Cir. 1977). In sum, nothing in the warrant satisfies the concerns at the heart of the Fourth Amendment's requirement of "particularly describing the ... things to be seized": that the government's search and seizure must not

---

11. Because the materials seized were not in plain view from the part of the office where some items were displayed for sale, this conclusion is not altered by any reduced expectation of privacy for business premises. See our Court of Appeals' decision last week in *United States v. Swart*, 679 F.2d 698, 701–702 (7th Cir. 1972).

turn into "a general rummaging for evidence of any type of federal conspiracy or fraud" (*Roche*, 614 F.2d at 7), and that such generalized rummaging through a suspect's business papers must not be done at the essentially unfettered discretion of a government official.

■ This is not necessarily to condemn every warrant authorizing seizure of "fruits, evidence and instrumentalities" of criminal violations. Where the statutes or the target activities identified in the warrant are themselves properly specific, a warrant drawn in such terms may be sufficiently particular and not a "general warrant." *See, Andresen v. Maryland*, 427 U.S. 463, 480–82, 96 S.Ct. 2737, 2748–2749, 49 L.Ed.2d 627 (1976) (crime of false pretenses with respect to one Lot 13T, of a real estate subdivision); *United States v. Coppage*, 635 F.2d 683, 686–87 (8th Cir. 1980) (possession, manufacture and distribution of methamphetamine, a Schedule II controlled substance); *United States v. Dennis*, 625 F.2d 782, 792 (8th Cir. 1980) ("extortionate credit transaction business").

■ Here however the warrant authorized the inspectors to seize all such broadly defined (or more accurately undefined) items ("fruits, instrumentalities and evidence") related to violations of the mail fraud statute, 18 U.S.C. § 1341. That statute embraces an enormous range of criminal activity. *United States v. George*, 477 F.2d 508 (7th Cir. 1973) epitomizes its broad sweep, construed to encompass every scheme to defraud furthered by use of the mails. Thus the warrant in this case made every scrap of paper—and every other item of property—belonging to White & Co. fair game for the searchers. Faithful to that authorization, they exercised their unhedged discretion by sweeping everything into their net—by a kind of "rummaging" too broad to be countenanced under the Fourth Amendment.

■ Moreover, the warrant breached the other Fourth Amendment limitation—

"probable cause"—by far exceeding the showing of such cause presented to Magistrate Jurco. This opinion need not elaborate on this aspect of the decisions in *Roche* and *Lafayette Academy; accord, United States v. Gardner*, 537 F.2d 861, 862 (6th Cir. 1976).

White's situation is not distinguishable from that of the defendants in *Roche* or *Lafayette Academy*. Cooper's affidavit dealt only with White's limited transactions with two companies, American Candy Co. and Armour-Dial Co. That showing cannot be universalized, as the government would have it, to the conclusion that White & Co. was entirely a "scam business"—thereby establishing probable cause to authorize seizing every document in the office, rather than just those relating to a particular phase of White's business, or to the particular transactions identified in Cooper's affidavit, or to transactions reasonably related to those identified matters. One swallow does not a summer make—nor even two.[12] White's transactions with American Candy and Armour-Dial did not establish probable cause for the all-encompassing warrant issued and executed here.

### *"Good Faith" as a Possible Exception*

■ Alternatively the government urges that even if the documents and other property were improperly seized from White's office, they should not be suppressed. For that purpose the government seeks to invoke a "good faith" exception to the exclusionary rule, as expressed by the Court of Appeals for the Fifth Circuit in *United States v. Williams*, 622 F.2d 830, 840–48 (5th Cir. 1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981).

Our Court of Appeals has not announced its own views on such a good faith exception. If it were to be adopted and applied, however, this case is an extraordinarily poor candidate for doing so.

12. Of course evidence of individual transactions could be sufficiently numerous and probative to support an inference of widespread fraud and hence to support a warrant whose scope exceeded the bounds of the supporting evidence. But *that* case is not *this* case.

As this Court has previously noted—in *United States v. Santucci*, 509 F.Supp. 177, 182–83 (N.D.Ill.1981)—if such a good faith exception to the exclusionary rule *were* to be recognized, it should be applied where it is really needed: to deal with the problems posed by the "pressures of law enforcement and the vagaries of human nature," as the Supreme Court said in *Michigan v. Tucker*, 417 U.S. 433, 446, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974). It may make good sense for the law to respond to "the problems [the exclusionary rule] poses to the policemen who must act on the firing line (unfortunately too often literally so) and under the need to make immediate law enforcement decisions without the luxury of deliberation." *Santucci*, 509 F.Supp. at 182.

But the decisions in this case were those of the postal inspectors and the Magistrate. None was subject to the "pressures of law enforcement and the vagaries of human nature" that afflict the policeman in the field. *Santucci, id.* at 183, spoke of a balancing of interests in the context of a United States Attorney's decision. Everything said there applies with equal force to the decision of the postal inspectors (on the facts of this case) to seek, and with even greater force to the decision of the Magistrate to issue, the warrant. Our Court of Appeals, while reversing *Santucci* on other grounds, 674 F.2d 624 at 631 (1982), appeared to recognize the validity of that aspect of this Court's opinion.

*Conclusion*

In this case the warrant was doubly flawed in Fourth Amendment terms: It did not "particularly describ[e] the . . . things to be seized," and it lacked "probable cause" to support the breadth of the authorized search. Accordingly, White's motion for suppression of evidence and for the return of property under Fed.R.Crim.P. 41(e) is granted.